Good morning, Your Honors. My name is Olivia Lee, representing Petitioner Rahel Mesfin. The microphone you have before you is solely for purposes of taping the argument. It does not amplify. So if you can speak up, that would be a good idea. Thank you. Again, my name is Olivia Lee, representing Petitioner Rahel Mesfin. I'd like to reserve two minutes for rebuttal. Thank you. The case before us today hinges upon the Board of Immigration Appeals and the immigration judge's finding of adverse credibility, which is not supported by substantial evidence. I would like to touch upon three points. First, the immigration judge and the Board of Immigration Appeals failed to notice facts that were actually in the record. Second, the adverse credibility finding, which is based on Ms. Mesfin's manner of responding, is not probative of non-credibility when factoring in things such as Ms. Mesfin's cultural background and the corroborating evidence she provided. And finally, Ms. — the Board of Immigration Appeals and the immigration judge's finding of adverse credibility, which is erroneous, is not harmless error, because Ms. Mesfin did provide sufficient evidence to show that she's eligible for the relief she sought. As to my first point, where the immigration judge and the Board of Immigration Appeals failed to find — failed to actually notice facts that were in the record, the immigration judge found that Ms. Mesfin was implausible because she testified that her father had been arrested based on his membership to the Ethiopian Orthodox Church. And he based this because the country condition reports show that 40 to 50 percent of the Ethiopian population adhere to that religion. However, the country condition reports at page 175 of the record indicate that there had been persecution of people belonging to that religious group. So the argument that Ms. Mesfin testified implausibly just doesn't — isn't supported by the record. It looks to me like the information in the record suggested that there had been problems, but the problems were people who were engaged in violence or seemed to be engaged in violence, and the government had not had a problem. There's nothing that said that those people, as far as I could see, were attacked because of the fact they were part of the church. They were attacked perhaps despite that fact because of actions they were taking. Now, there is evidence that seems to say that in this record. Yes, Your Honor. The evidence does show that there might have been some violence between these two judges' determination that Ms. Mesfin testified implausibly that someone could be persecuted based on membership to this group. Yet another instance that Ms. Mesfin — that the immigration judge and the Board of Immigration Appeals failed to notice facts in the record is actually the arrest of Ms. Mesfin's father. The immigration judge found that Ms. Mesfin had two reasons, testified to two statements that Ms. Mesfin had two separate reasons for Ms. — for the — Ms. — her father's arrest. However, he failed to notice that there were actually two arrests in the record, one in 1978 and the other in the 1990s. And the one in 1978 was based on sheltering Ms. Mesfin's brother from mandatory military service, and the other one in the 1990s occurred because of membership to that church. And yet again, the immigration judge failed to notice that Ms. Mesfin had — had mentioned Mahari Segei prior to her removal hearing. He — he stated that for the first time, she had — she stated her encounter with Mahari Segei, and the — and in the record, in her asylum application at page 188, it indicates that Ms. — Ms. Mesfin — Ms. Mesfin wrote in her asylum application that Mahari Segei had implicated her, and also — That seems to be related largely to her sister, that he'll — he'll treat me like he treated my sister. Yes, Your Honor. That's what it says. Yes, he's mentioned, of course. As a matter of fact, what really goes to the heart of this thing, or one thing that And that shows up for the first time at the hearing before the I.J. And before that, it looked like it was the sister that happened to. As a matter of fact, it looked like it happened to the sister after your client was actually in this country. What do we do with that? That — that seems like it goes right to the heart of this thing. Yes, Your Honor. It does seem that Ms. Mesfin mentioned for the first time about her arrest during her removal hearing. However, there's two principles of this Court that we must consider. First is that asylum applications that are prepared without the assistance of counsel by applicants with limited proficiency in English should be read charitably, and that's Smolniakova v. Gonzales. And additionally, the second principle of this Court is that asylum interviews that are inherently unreliable — are inherently unreliable as a point of comparison for purposes of credibility, because they contain factors mentioned in Sin v. Gonzales, such as there's no transcription of the interview, there's no indication that an oath was administered, and there's no indication that Ms. Mesfin was ever allowed to make a statement at the end of the interview. And — The heart of her claim is that she was — she was put upon. That's the heart of her claim. It's never mentioned until she gets to the — before the IJ, and then it seems to be tracking what is obviously her sister's affidavit. The — Strangely enough. The affidavit and — the affidavit — the events described in the affidavit and Ms. Mesfin's testimony are actually factually different. In the affidavit, the arrest — the arrest happened when her sister went into the district office, and then she was detained there, whereas Ms. Mesfin testified to an arrest that happened at her church. Additionally — Well, did that make it better or worse? Well, it shows that these were two different events that were described. But it shows that — that she didn't even mention this horrible thing that happened to her, supposedly being beaten by sticks and spat on. None of that's mentioned until — Yes. Yes. Even in the affidavit, where her sister's talking about what happened to her, if that's the position we're going to take, she doesn't mention any of that happened to her. Yes, Your Honor. She does not mention the arrest at all. But this Court in — No, it's worse than that. It's not that she doesn't mention her arrest the first time around. It's that she signs an affidavit saying her sister was arrested, and then in the interview that she has, the asylum interview, she's asked directly, were you ever arrested? She answers, no. And then at the hearing, when she's asked — when she's confronted with this inconsistency, as the I.J. should do, she answers the — she gives the explanation that she answered no. It's possible because I did not have a lawyer. And an interpreter. Yes, Your Honor. She did — So, in other words, what are we to make of that? Isn't that substantial evidence that goes to the heart of the matter that supports the adverse credibility finding? The asylum interview — all the evidence from the asylum interview is taken by the asylum interviewer's notes. And again, this Court has stated that it's an unreliable point of comparison. We have not said that it is always unreliable. I'm sorry? We have never said that it is always unreliable. Yes, Your Honor. You're saying it can be, but we have never said that it was as a matter of law, have we? No, not as a matter of law. It's just — Okay. By the way, you're down to a minute and 32 seconds. Thank you. May it please the Court. Rebecca Hoffberg on behalf of Respondent, the United States Attorney General. The record does not compel reversal of the agency's adverse credibility determination, which was dispositive of Ms. Mesfin's claim of eligibility for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture. This case has already been reviewed by an asylum officer, then an immigration judge, and then the Board. Ms. Mesfin's testimony alleged an arrest and a beating that was entirely omitted from her written application, the accompanying affidavit, and her interview with an asylum officer. Furthermore, Ms. Mesfin failed to provide corroborating documentation for her claim of past persecution, as the affidavit from her sister states only that her sister experienced a detention and her sister lived nearby and could have testified at her hearing. She also failed to corroborate her claim of future persecution, as the Department of State report in the record states that the — Where in the record is there a reference that the sister lived nearby and could have testified but didn't? That is on — I can tell you exactly what page. Her sister lived 55 miles away in San Jose on the record, page 90. Thank you. And when she was asked, why didn't your sister come, she said, I didn't think she was needed. As I was stating, the Department of State report in the record states that the  40 to 50 percent of the population have membership in this church and that there was no general persecution of members of this faith. Moreover, Ms. Mesfin's demeanor when attempting to recall basic facts about her own detention was hesitant and full of long pauses, which further undermined her credibility and supported the denial of relief. First, with respect to the fact that she entirely omitted the arrest and beating, as Your Honor pointed out, this goes directly to the heart of her claim. Because as the asylum officer noted, she could not have established past persecution based on the fact that she initially told the asylum officer and stated in her written application that in 1990, officers came and questioned her Christian support group about what they were doing and simply said, what are you doing? You shouldn't be doing this. Please go home. And that's what happened. And she went home. And a week later, her father said, well, I think you should leave the country. I have an experience with the government being arrested, and it's probably not safe for you to stay here. So that is what happened. And there was no allegation of any detention or arrest or past persecution at that point. Then, for the first time at her hearing, she mentions that she was beaten with sticks and detained. Now, you brought up a point. Opposing counsel was talking about the reliability of the asylum interview. It's important to note in this case that what happened was her initial application was prepared by a cousin whom she says, quote, that she trusted and that it was read back to her by her sister. And this is what she told the asylum officer. She later claimed at her hearing that she doesn't remember anything about this. But this is what she told the asylum officer. But even if you don't want to put so much weight on the interview with the asylum officer, which arguably in this case you should as the asylum officer wrote down contemporaneous notes as the interview was taking place, and she said that she did not ask for an interpreter at her hearing. And this is on page AR, the record 79. She said she trusted her cousin. And on 91 said that she did not ask for an interpreter and that she had been going to high school and community colleges in the U.S. and that she. Did she request an attorney? As far as I know, she did not request an attorney at that point. There was nothing in the asylum officer's interview notes that said that she had asked for an attorney or an interpreter and that she was relying on people who she trusted, her family members, to record exactly what she had told them in her written application and then in the accompanying affidavit, which was written by her sister. Now, the reason why you don't even need to give so much weight to the asylum officer's interview, which, as I mentioned, I think you should in this case, her written application and affidavit by her sister are consistent with each other as well and also with the interview with the asylum officer. And those were directly done by her relatives, again. So there was no possibility that they could have miscommunicated when they're speaking in her own native language to create the initial application and her sister's affidavit. And so those two written pieces of documentation prior to the hearing are consistent with each other and both inconsistent with her testimony at the hearing, which, again, because it goes directly to the heart of the claim, directly to the past whether she experienced a beating and was detained was crucial in this case. And she mentions it for the first time at her hearing. Now, the other part of the inconsistency comes when she's asked about this detention at her hearing. So for the first time she's talking about it, and then she's pausing, she's hesitating, she does not recall how long she was detained, and then she talks about it being around the time that the patriarch was deposed. And of course she says it was around that time or about the time he was about to be deposed, however you want to construe that ambiguous language, but either way it was ambiguous. Now, her argument that she can try to attribute that to the difference in calendars is not justified, because this has to do with a sequence of events that occurred around the time that somebody was deposed. There is no confusion about when that person was deposed in the sequence of events. And that person was actually deposed, according to the record, in 1991, October 8, 1991, on page 207 of the record, which she claims this is what supports her case, but it says that that was when the patriarch received the letter telling him to vacate the residency. So that would go along with what happened to her sister around the time that he was deposed in 1992, after Ms. Mesvin was in the country already, these events happened to her sister and her father. Now, she claims she was arrested around the time, and she uses several different ways of saying it. She talks about being 17, and she talks about it, she says that she left the country approximately a year after her arrest. So the record indicates that she came to the U.S. in October 1991. This means that her arrest probably occurred around October 1990, if it happened. And then she also simultaneously says that, you know, she was asked who else was arrested. She says, my sister, my father. Then she says that her father was arrested around the time of 1990, and that's on page 77. So, again, she's sort of putting herself in the same position that her sister was in a year later, where her sister and her father were allegedly arrested, and her father was then forced to sign a confession that they were a member of an opposing political group. And so, basically, the events that are described by her sister in the affidavit are then meant to refer them later to petitioner, regardless of whether they also happened to her sister. She never mentions, despite the fact that in the initial application and in the affidavit, they mention the numerous things that have happened to other members of the family. They mention the cousins, the uncles, the father, everybody who has had an experience. And yet the petitioner herself does not mention her own experience. And this is a significant inconsistency. When you're talking, she had two written opportunities to talk about what happened to her. If this beating happened to her, then she would have mentioned that if she would have mentioned the things that happened to her ancestors and the things that were so nearly identical to her own a year later, in terms of the type of detainment that she says happened and that she was forced to sign a confession. If this was so similar to her sister, it seems so likely and obvious that it would have been included had it happened. And so this ground, this was a very well-supported ground of inconsistency that the agency used to find her not credible. The fact that she called her testimony into question by providing these inconsistent accounts required corroboration, which in this case was not properly, as I mentioned, there was none produced that could sufficiently support her claim. So in conclusion, the adverse credibility determination is amply supported by the record. The immigration judge gave specific and cogent reasoning which was affirmed by the board. And the record does not compel reversal of this determination. For these and the foregoing reasons, we ask that the Court deny the petition for review. Thank you. Unless the Court has any further questions, we rest on our brief. On rebuttal, I'd like to address two points. One is Where is the father now? It's not clear in the record where the father is located. The sister is in San Jose, right? Correct. I'd like to address two points. One is Ms. Messwin's demeanor, and two is the corroborative evidence. As to Ms. Messwin's demeanor, the immigration judge failed to consider three other issues when determining her demeanor. One is that she had to convert between the Ethiopian to the Western calendar, and that's at page 77 of the record. Also, he himself instructed her to take her time when answering questions, so it seems unfair to punish her for taking pauses while following his instructions and finding her noncredible. And it cannot be overlooked that there was an amharmic interpreter at the removal hearing. And as to the corroborative evidence, Ms. Messwin did provide his sister – her sister's affidavit as corroborative evidence, which helped to buttress aspects of her testimony, such as her father's arrest in the 1990s, and that the EPDRF had imputed political opinion upon her family. Thank you, Your Honors. Thank you very much. Thank you for your presentation. The case of Messwin v. Mukasey will be submitted. And we'll go to the next case on the calendar, which is U.S. v. Bubar. May it please the Court.
judges: Fernandez, Gould, Bea